The next case, number 221499, Universal Trading & Investment Company, Inc. v. Bureau for Representing Ukrainian Interests in International and Foreign Courts, et al., at this time, Attorney Reardon, please introduce yourself on the record to begin. Thank you, Mr. Clerk. May it please the Court, Stephen Reardon for the appellant, Universal Trading & Investment Company. So this case, judges, has got a long history, as I'm sure you have all seen from the record. Just to briefly review, this case was before this Court regarding the commercial exception to the Foreign Immunity Act, Foreign Sovereign Immunity Act, at which point this Court decided in favor of the District Court's decision that it did meet the exception. It involves what essentially was a debt company, debt retrieval company, investigation company, that is Universal Trading & Investment Company, we'll use Utico, going forward and attempting to have a complaint of breach of contract against the sovereign, which in total comprises the Ukrainian government, prosecutor general's office in Ukraine itself. There are several matters that we disagree with on the District Court, but the gravamen of our argument is that the Court denied three motions to amend this complaint, despite the fact that there was a variety of new information over the course of this litigation. In short, Utico was awarded two separate agreements, at least, regarding the recovery of assets due to a fraudulent misappropriation of some of the former leaders of the country and their associates, Pablo Lazarenko and Petro Kirichenko. If I might, instead of focusing on that, I'd like to just ask you a couple of questions, or focus you into talking about the one tranche of money that was returned to Ukraine on March 18th, I think 2009, pursuant to that August 2020 Swiss judgment. Yes. Because I'm having some difficulty, when I read your papers, of parsing that. So that judgment refers to a number of different companies, right? Not so much companies, but holding companies. Yes. Holding entities. So if we could just focus in, say, on Will North, right, which is one of those holding entities mentioned in that judgment. Yeah. What information about that company, about Will North, did Utico recover, and what is your evidence of that? Well, the evidence was provided by multiple declarations in the original lawsuit, and it was presented to the court as a multi-level scheme. This wasn't just Will North. Will North was where it ended up. So when you say it was provided, do you mean in organizational documents? Sorry. I mean that Utico not only identified the documents, but they used powers of attorney awarded by the government of Ukraine to freeze those funds in those companies. Do you have any particular sites in your papers to that? As you know, the appendixes here are vast, shall I say. Right. Well, all I can say is that it is clear from the original complaint where we pleaded these things, and we at that point proposed many different documents that would prove it. We have a chart, actually, as an appendix to this. You see at the end of the appendix, at the end of the brief, the chart shows what exactly the scheme was and where it went. And there was many, many different entities that were eventually distilled down to holding companies that indeed had the funds. So let's just circle back, though, say Will North. When did you recover evidence relating to Will North, and how was it helpful? Well, it was all covered in the latter part of 1989 after the agreements were concluded with Ukraine. They had a delegation that came to Washington, and unfortunately the agreements themselves I wouldn't say are particularly persuasive in terms of excellent contract documents, but they are what they are. And once those agreements were signed and accepted by the parties, they were then put into effect by Utico. And over the next several years and continuing, Utico identified and then went to the various sovereignties, particularly in the Virgin Islands, used the powers of attorney to convince the courts in those jurisdictions to freeze the money that was there. And this was a key thing, because without doing that, the defendants, who ultimately were the defendants, Kirochenko and Lazarenko, could have moved them around once again, and they would have been chasing them forever. Let me ask you a different question, though, still dealing with that tranche of money. So in your reply brief you have a table on pages, I think it's 11 and 12. I want to ask specifically about GHP, which is mentioned in that table. Are there documents about GHP in the appendix? The appendix to this appellate brief? Yeah, because when I look at the table in the reply brief, it all seems to relate to other entities and not GHP, which is mentioned there. So I'm trying to match that up to ‑‑ I feel like I'm missing something about GHP. Well, I don't ‑‑ to be frank, I cannot tell you specifically what the activities in GHP were, but all the activities in these jurisdictions were similar. GHP was just another holding company that had received funds that were, again, trickled down from other holding companies that were part of the entire investigation. And it wasn't just one investigation, it was an ongoing set of investigations involving all of these entities that were eventually determined to hold approximately $270 million, and it was believed there were more than that. But that was the original amount of money that the identified, that Utico identified, and that was the original amount of money that eventually told what they had frozen and advised Ukraine of and sent them the documents from those investigations so that they would then hopefully file the necessary paperwork, the necessary complaints in the jurisdictions to retrieve the funds. Essentially, the money was there for their taking, because by that time, UESU, which was the holding company, excuse me, the gas company that essentially they stole from. In any case, again, I'll get back to, if I can get back to the issue of the denial of the motions to amend. First of all, the first motion was filed in 2012. That was a motion that was filed, and it was in abeyance for a number of years before eventually being denied. There was a leave to file, another addendum. Just so I understand how this argument fits in with what's being challenged and what's not being challenged. If I understand the district court correctly, there's a large amount of money that a motion for leave to amend couldn't cure his rejection of your claims with respect to that money because of the in connection with holding that he makes, correct? Well, yeah, there's three different, two different essential large catches of money. One is the Swiss assets. The other is all these other assets that were in Tiwa, Poland, a number of different jurisdictions for which Utico had frozen. They're not even available to the defendants. And with respect to all of those, the district court's given a legal ground for rejecting that, but I'm assuming the motion for leave to amend doesn't affect, correct? I would say no in the sense of rightness, but that's not true, because we also had proposed a new complaint based on various other quasi-contract causes of action. Unjust enrichment, for one thing, would be one because, well, that would be more in line with the- Let me ask it a different way. If we hold constant and take as correct, though you may challenge it, his holding about in connection with, is there some aspect of your argument regarding error with respect to the denial of the motion to leave to amend that would have force even accepting his ruling adverse to you on the in connection with point? Well, the problem we have, of course, is the divergence between the agreements, which specifically- If you just- It'll help me if you just can do a yes or no first before you go on to the rest. Yes. Yes. That there would be a difference, yes. It would be helpful to have those- The amended complaint would be helpful in addressing that issue, yes. The issue of the- Okay, is there- On return funds. And are you arguing that the motion to amend would be helpful even apart from the way they would help on that issue? Yes. Okay. So could you distinguish between those two things in describing which motions to amend you say there was error with and how there was? Because if you're doing it at a general level, it's hard for me to track where the error is. Well, to one extent or the other, all three of them were complaining that all three motions or attempted motions were relevant to changing facts during the course of this situation. Yeah, but for me to get the force of it, it would be helpful if I knew which facts relating to which arguments so we can then evaluate whether there was error with respect to each one. Well, the unjust enrichment argument would apply, of course, to the Swiss funds. Because they eventually- And by the way, eventually means well, well after the time that they received them admitted that they had received them after denying them a number of times in between. As far as the other assets are concerned, as I said, it brings the question of whether or not when Ukraine got into this that they actually had any intention going forward of recovering the assets. So the assets were revealed to them as early as the early 2000s. But I guess what is the motion to amend that you're talking about that was denied? What's the content of it? Where was the error in denying it? Well, there were several new counts. We had basically- So the motion to amend you're talking about is the motion to amend that would have added new counts, and that's unjust enrichment, what else? There were several, including unjust enrichment, but there was also fraudulent concealment. And all of those would survive as to all of the funds? Not all of them. Some of them would. As I said, we have a differential here between the funds in the various offshore entities that had not been returned, and we have the funds that actually were returned. Correct. Which of the motions to amend would bear on your ability to succeed, whether you have now not succeeded under the district court's ruling, with respect to the returned funds? Well, it would be more appropriate to discuss the various counts in the motions to amend. And the most recent motion to amend, which was denied, was, again, unjust enrichment. That would certainly be part of it. Fraudulent concealment. And, again, breach of the contracts based on the fact that they had failed to make any attempt whatsoever to recover the funds. Those basically are the three things that we're addressing. Okay. Thank you. In any case, the failure to do this, to allow this amended complaint, is our major complaint. We have other issues. We don't believe that because of the fraudulent concealment that the case should not have told, for instance, against the Swiss assets. They are clearly returnable. And the other thing was the court decided that, for some reason, it decided that we did not do what we were supposed to do, that is, UNICO, in providing documents to the Ukraine, which is all that the agreements call for, because we didn't send them to Switzerland, which was not in the contract. Thank you. Thank you. At this time, Mr. Shaw, please introduce yourself on the record again. Good morning, Your Honors. May it please the Court, I'm Robert Shaw, and I represent Ukraine and the other Ukraine in Apalis. Judge Woodlock disposed of this case on summary judgment. It really was a three-step process. First, with respect to the alleged $260 million worth of assets taken by Lazarenko and Kurochenko that are supposedly scattered all over the world that UNICO helped provide some information concerning, allegedly. He found simply that those claims are unripe because those funds have not been repatriated to Ukraine. When Judge Woodlock made that decision in 2013, or 2018, excuse me, for the first time in the case, UNICO made a new contention, and that is that it had something to do with the recovery of assets from Switzerland. Now, you have to understand, the recovery of assets from Switzerland is pleaded in UNICO's 2010 complaint. It's right there on the face of the document. They were aware of it, but they never took credit for the repatriation of those assets. And the reason they didn't take credit for it is that it was altogether clear to everyone involved that it was the canton of Geneva and not UNICO that was responsible for the recovery of those particular assets. But confronted with the reality that- Do you know at what point the Swiss investigating judge started to look at Lazarenko and Kurochenko? It was certainly before the May 15, 2000, excuse me, 1998 date on which UNICO claims it was hired. There are decisions, there's a decision in the record which discusses, you know, the investigation and conclusions that were reached before that date. They also were making requests, the Ukrainian government is making requests to the Swiss government, asking for information about what the Swiss investigation is uncovering. And this was a completely independent investigation. But it was only at that moment when UNICO discovers that Judge Woodlock is going to find their entire claim to be unripe that suddenly they put the Swiss assets in at issue. And my brother stood up before Judge Woodlock and explained that UNICO did the necessary filings in Switzerland to freeze these assets. And Judge Woodlock said, well, if that's the case, then you might have a claim here. So we'll do discovery into what exactly happened in Switzerland. He authorized UNICO to a letter of surrogacy to Swiss authorities to allow UNICO to conduct discovery in Switzerland to try to find any way in which information that, this is their theory, that information that they uncovered back in the late 1990s was passed over to Ukrainian authorities, who they speculate may have passed some unspecified information off to Swiss authorities, who may, they speculate, have utilized that information in the prosecution of Lazarenko and Karachenko. So this is the causal chain that they would draw. So all of this, just keep in mind, only bears on a tiny fraction of the case. The $260 million is unripe. Most of the claims to the $15 million in assets recovered from Switzerland is time-barred. And as Judge Montecalvo was suggesting on opening argument, the fact issue here was whether UNICO had adduced any evidence to demonstrate that it was in any way helpful to the recovery of this one tranche of assets in Switzerland, this $4 million. And that's because that money was repatriated into the Ukrainian treasury within the limitations period. And Judge Woodlock correctly found that UNICO had failed to meet its burden to adduce evidence showing that a reasonable fact finder could conclude that they were helpful. Just on this small point, do you understand there to be any contention regarding the denial of the motion to amend that bears on this particular question, in other words? I do not, Your Honor. Okay, so it's the – insofar as there are other grounds for leading you to think that all that's left in play is this fact question regarding that particular sum of money. Exactly. The arguments from opponent about the need for a motion to amend have no bearing on that particular issue. I agree, Your Honor, yes. And so I take it implicit then in the way you're presenting the case is that the motions to amend fail pretty much for the reason that the district court gave, which is that they can't solve the time bar problem, they can't solve the in connection with problem, et cetera. Precisely, Your Honor. Okay. They consisted largely of – well, entirely of an effort to re-litigate issues that had already been decided against Utico over the long history of this case. The fraudulent concealment claim is an effort to re-litigate a discovery dispute that was decided against Utico. This unjust enrichment case claim, it comes very, very late in the case after we had already moved for summary judgment. The case had gone on for 10 years almost – no, eight years at that point. And of course, their claim is based off the existence of a contract between Ukraine and themselves. So the unjust enrichment claim would fail because this is a valid contract. We're not denying that there exists a contract. So, yeah, Judge Woodlock – and of course, the standard review on that question is a deferential abuse of discretion standard. And Judge Woodlock explains in his decision what he was up against here, which is a litigant who was bobbing and weaving, changing their story, abusing the court procedures, constantly shifting kaleidoscope of law and fact over the course of a very long period of time. And I think the district court did not err by denying the motions to amend under those circumstances. And to turn back to Judge Montecaldo's question, you know, was there anything substantial in this record showing Utico's performance or involvement with the recovery of assets from Switzerland? The answer is categorically no. There are affidavits. There's an affidavit submitted by Mr. Lambert, who probably the strongest piece of evidence they offered is in their reply brief, and they've highlighted it saying that there was allegedly a phone call in which Mr. Lambert spoke to some Ukrainian, unspecified Ukrainian authority who said that they had passed some unspecified information off to Swiss authorities. I mean, I would say that that is rank hearsay, inadmissible on summary judgment to demonstrate a actually contested fact on this issue. And it's as close as he gets. There's nothing that comes out of the Swiss investigation that he can point to to say that, oh, this had to have been Utico's information that was provided. And to the contrary, when I deposed Mr. Lambert, this is Utico's principle, you know, I asked him, you know, how do you know that the Swiss relied on your information in particular? And he explained point blank that the answer is that they tied Lazarenko and Kirichenko to these entities. And the reality is the records from Switzerland show that the Swiss authorities had tied Lazarenko and Kirichenko to these entities before Utico ever comes on the scene and was hired. So it can't be possible that this is the piece of information that they provided that they were somehow helpful. When you say the record, do you mean the Swiss investigating judge's decision? Yes. Is that the June 25th, 1999 decision? There are two of them, and I don't know the dates off the top of my head, to be honest with you. Are they in the appendix or are they in the district court? They should both be in the appendix. Because I couldn't find one of them, but I did find it on the docket. You did find it on the docket? Yeah, on the district court docket. So I guess I'm just wondering which you're referring to or if you're referring to both. I was referring, I believe, to the earlier of the two decisions. And forgive me for not knowing the specific date off the top of my head. That's fine. Thank you. I'm trying to think. Well, if the court has no further questions, I think we can rest on our briefs. Thank you. Thank you. Thank you. That concludes our time in this case.